IN THE UNITED STATED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Bluefield Division

| |
INTERNATIONAL UNION, UNITED       |
MINE WORKERS OF AMERICA, *et al*.     |
    |
    Plaintiffs.     |
    |
v.     |     Civil No.   <u>1:16-cv-12506</u>
    |
CONSOL ENERGY, INC.     |
    |
    Defendant.     |
    |

-------------------------------------------------------------

## COMPLAINT FOR INJUNCTIVE RELIEF

1.      This is a civil action for an order enjoining Defendant Consol Energy, Inc. ("CONSOL") from unilaterally terminating a group health insurance plan maintained for the benefit of retired coal miners pending the disposition of a dispute over its authority to do so that is currently being processed pursuant to the contractual resolution of disputes mechanism in the plan and the parties' collective bargaining agreement.

## I.    PARTIES

2.      Defendant CONSOL is a publicly owned energy company engaged in the operation of mines and facilities related to the production of coal, which it sells worldwide to electricity generators and steelmakers. For the one year period beginning with the fourth quarter of 2015 through the third quarter of 2016 - the most recent period for which data is publicly available - CONSOL reported gross profits greater than $1,017,000,000. CONSOL maintains its corporate headquarters in Pittsburgh, Pennsylvania and at least one office in this judicial district at 2481 John Nash Blvd. Bluefield, WV 24701. CONSOL is engaged in industry or activity

affecting commerce within the meaning of Section 2(2) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(2) and Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

3.     Plaintiff James Asbury is a resident of this judicial district who resides in McDowell County, West Virginia. He is a 58-year-old retired coal miner who is a participant in and beneficiary of the group health insurance plan at issue in this case, which CONSOL maintains for the benefit of retired UMWA miners.

4.     Plaintiff Roger Beavers is a resident of this judicial district who resides in McDowell County, West Virginia. He is a 63-year-old retired coal miner who is a participant in and beneficiary of the group health insurance plan at issue in this case, which CONSOL maintains for the benefit of retired UMWA miners.

5.     Plaintiff Larry Brewster is a resident of this judicial district who resides in McDowell County, West Virginia. He is a 67-year-old retired coal miner who is a participant in and beneficiary of the group health insurance plan at issue in this case, which CONSOL maintains for the benefit of retired UMWA miners.

6.     Plaintiff George Dunford is a resident of this judicial district who resides in McDowell County, West Virginia. He is a 70-year-old retired coal miner who is a participant in and beneficiary of the group health insurance plan at issue in this case, which CONSOL maintains for the benefit of retired UMWA miners.

7.     Plaintiff Clinton Fields is a resident of this judicial district who resides in McDowell County, West Virginia. He is a 65-year-old retired coal miner who is a participant in and beneficiary of the group health insurance plan at issue in this case, which CONSOL maintains for the benefit of retired UMWA miners.

8.      Plaintiff Arnold Marrs is a resident of this judicial district who resides in McDowell County, West Virginia. He is a 77-year-old retired coal miner who is a participant in and beneficiary of the group health insurance plan at issue in this case, which CONSOL maintains for the benefit of retired UMWA miners.

9.      Plaintiff Eugene Schrader is a resident of this judicial district who resides in Mercer County, West Virginia. He is a 72-year-old retired coal miner who is a participant in and beneficiary of the group health insurance plan at issue in this case, which CONSOL maintains for the benefit of retired UMWA miners.

10.     Plaintiff International Union, United Mine Workers of America ("UMWA") is a labor organization engaged primarily in the representation of coal miners. The UMWA maintains its principal place of business in Triangle, Virginia and also maintains offices within this judicial district in Beckley, Charleston and Chapmanville, West Virginia. The UMWA represents employees in an industry affecting commerce and is a labor organization within the meaning of Section 2(5) of the NLRA, 29 U.S.C. § 152(5), and Section 301(a) of the LMRA, 29 U.S.C. § 185(a).

## II.      JURISDICTION AND VENUE

11.     This Court has jurisdiction over the claim for breach of the collective bargaining agreement pursuant to Section 301 of the LMRA, 29 U.S.C. § 185; and, pursuant to its federal question jurisdiction codified at 28 U.S.C. § 1331. Venue is appropriate in this judicial district, where Defendant resides, where a substantial part of the events or omissions giving rise to the claim occurred, and where Defendant is subject to the Court's personal jurisdiction.

## III.   FACTUAL ALLEGATIONS

<u>Relevant Historical Background of the Lifetime Retiree Health Benefit</u>

12.     Since shortly after World War II, health and retirement benefits in the coal industry have been provided to employees through a multiemployer arrangement.  This arrangement has been carried forward for over 60 years through collective bargaining or through legislation enacted by Congress. Beginning in 1950, pension and health benefits for retired miners were provided through a single plan, known as the UMWA Welfare and Retirement Fund of 1950.  The guarantee of lifetime retiree health care benefits was contained in numerous subsequent agreements negotiated between the UMWA and the Bituminous Coal Operators Association ("BCOA"), known as the National Bituminous Coal Wage Agreements ("NBCWAs"), maintained this structure. <u>Eastern Enterprises v. Apfel</u>, 524 U.S. 498, 504-05 (1998).

13.     In the 1974 NBCWA, the single plan structure was abandoned in favor of four separate plans.  These were the UMWA 1950 Pension Plan ("1950 Pension Plan"), the UMWA 1974 Pension Plan ("1974 Pension Plan"), the UMWA 1950 Benefit Plan ("1950 Benefit Plan"), and the UMWA 1974 Benefit Plan ("1974 Benefit Plan").  <u>See</u> <u>Davon, Inc. v. Shalala</u>, 75 F.3d 1114, 1125 (7th Cir.), <u>cert.</u> <u>denied</u>, 519 U.S. 808 (1996).  Notwithstanding their division into separate plans, these four plans continued to be administered together, and are collectively referred to as the "UMWA Health and Retirement Funds" (the "Funds").

14.     Subsequent to the expiration of the 1974 NBCWA, as the result of difficult and contentious negotiations that included a lengthy industry-wide strike, the system was again changed in the 1978 NBCWA.  <u>Id.</u> at 1118.  <u>See</u>, <u>e.g.</u>, <u>Holland v. Double G Coal Co.</u>, 898 F. Supp. 351, 353-54 (S.D. W. Va. 1995).  At that time, primary responsibility for providing health benefits for active miners and retirees, as well as their dependents, was shifted to the individual employers

who were required to establish their own separate health plans (hereinafter "Employer Plans"). The Employer Plans were to provide the same level of benefits as that provided by the 1974 Benefit Plan, and in each subsequent NBCWA the parties have negotiated a standard Employer Plan which is incorporated into the collective bargaining agreement. Although direct responsibility for provision of healthcare benefits was now placed upon the employers, the 1974 Benefit Plan was retained as an orphan plan to provide benefits to "retired miners" and their dependents whose last employer was "no longer in business." Id. Moreover, the employers expressly agreed to guarantee the benefits from each employer's own Employer Plan for the term of the existing NBCWA. Id.

15.    After the 1978 NBCWA was negotiated, a series of court decisions recognized that the retirees were entitled to lifetime benefits, but that the employer's obligation was limited to the term of the contract and the 1974 Benefit Plan was obligated to provide the benefits where the employer was no longer signatory.  District 29, UMWA v. Royal Coal Company ("Royal I"), 768 F.2d 588 (4th Cir. 1985); District 29, UMWA v. UMWA 1974 Benefit Plan ("Royal II"), 826 F.2d 280 (4th Cir. 1987); United Mine Workers of America v. Nobel, 720 F. Supp. 1169 (W.D.Pa. 1989), aff'd, 902 F.2d 1558 (3d Cir.1990).  While affirming that the retirees were entitled to lifetime benefits, these decisions resulted in a number of companies that left the coal business shifting their retiree liabilities to the 1974 Benefit Plan, to be funded by the remaining signatory employers.

16.    The 1993 NBCWA carried forward the multiple references to benefits "for life" or "until death" that have been construed to create the promise of lifetime benefits. These references were contained in Article XX of the NBCWAs since 1974, in a section designated "General Description of Plan Benefits."   The 1993 NBCWA also added new language that was expressly

intended to make it clear that the last employer of a retiree was responsible for providing those benefits, notwithstanding the expiration of the contract:

> The parties *expressly agree* that the language references to "for life" and "until death" that are retained in this General Description *are intended to mean that each employer will provide, for life, only the benefits of its own eligible retirees who retired between February 1, 1993 and the Effective Date, or who retire during the term of this Agreement.* A retiree shall be considered to be a retiree of an Employer if his last signatory classified employment was with such Employer. The benefits and benefit levels provided by an Employer under its Employer Plan are established for the term of the Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement. (Emphasis added).

Similar language was added to the standard 1993 Employer Benefit Plan negotiated along with the 1993 NBCWA.

17.     The 1993 NBCWA also created a new multiemployer plan for orphaned retirees, the UMWA 1993 Benefit Plan, to replace the 1974 Benefit Plan, which had been merged with the 1950 Benefit Plan and closed to future retirees by the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), 26 U.S.C. §§ 9701-9722 (2006). The intent of the UMWA and BCOA in drafting the 1993 NBCWA is clear: each employer would be responsible for the benefits of its own retirees for the life of the retirees, and the 1993 Benefit Plan would be responsible only if the last employer were both out of business and financially unable to provide benefits. Furthermore, unlike the old 1974 Benefit Plan, the 1993 Plan's funding was limited to the fixed collectively bargained contribution.

18.     The parties explicitly intended to require each employer to provide benefits for life, and to prevent employers from dumping their retirees on the new orphan fund, and added new language to the 1993 NBCWA to emphasize that intent:

> For purposes of determining eligibility under the 1993 Benefit Plan and Trust, the Employer is considered to be "no longer in business" only if the Employer meets the conditions of (I) and (II) below.  *The parties expressly intend that each of the requirements of (I) and (II) be met.*
>
> (I)     The Employer has ceased all mining operations and has ceased employing persons under this Wage Agreement, with no reasonable expectation that such operations will start up again; and
>
> (II)     The Employer is financially unable (through either the business entity that has ceased operations as described in subparagraph (a) above, including such company's successors and assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Wage Agreement or not) to provide health and other non-pension benefits to its retired miners and surviving spouses.  (Emphasis added).

19.    Prior to the 1993 NBCWA and the Coal Act, the <u>Royal I</u> decision limited the obligation of an employer to the term of the agreement.  Subsequent court decisions, including <u>Royal II</u> and <u>Nobel</u>, required the 1974 Benefit Plan to provide lifetime benefits if those benefits ceased to be provided by the employer, either because it ceased to operate or otherwise ceased to be bound by a successor NBCWA.  In effect, under those decisions, the retiree obligation "shifted" or was transferred from the employer to the 1974 Plan at the expiration of the agreement if the employer did not sign a successor agreement.  The 1993 NBCWA was specifically intended to change that result, placing a permanent lifetime obligation on the last signatory employer.  "The most immediate problem under the 1974 NBCWA, as interpreted by the courts, was that employers' obligations to provide benefits ceased once they were no longer signatories to the contract.  The new 1993 provision altered that situation by making it clear that the employers' obligation to provide health benefits continued for the life of the employer, not simply for the life of the collective bargaining agreement." <u>District 17, UMW v. Brunty Trucking Co.</u>, 269 F. Supp. 2d 702, 708-09 (S.D.W. Va. 2003).

20.     The UMWA and the BCOA have negotiated a number of NBCWAs since 1993, including the 1998 NBCWA, the 2002 NBCWA, the 2007 NBCWA and the currently-effective 2011 NBCWA.  Each of these NBCWAs has continued the permanent lifetime obligation to provide health care to eligible beneficiaries in accordance with a standard Employer Plan incorporated into the collective bargaining agreement. A true and correct copy of the relevant portions of the 2011 NBCWA related to health and retirement benefits is attached hereto as Exhibit A.[1]

Relevant Historical Background of Uniform Dispute Resolution Under the NBCWA

21.     In order to ensure uniformity among the Employer Plans established pursuant to the 1978 NBCWA, the UMWA and BCOA established the "Resolution of Disputes" or "ROD" procedure. Under the ROD procedure established under that contract, disputes arising under the separate benefit plans maintained by each individual employer were subject to resolution by the Trustees of the UMWA 1950 Benefit Plan. In the 1981 NBCWA, the parties added language stating that the "[d]ecisions of the Trustees shall be final and binding on the parties." That language has been included in every NBCWA since 1981, including the currently effective 2011 NBCWA. Article XX, Section (e)(5). Ex A at NBCWA p. 166. In the 1993 NBCWA, the authority to resolve disputes under the contractually required Employer Plan was conferred on the four Trustees of the UMWA 1993 Benefit Plan (the "Trustees"), two of whom are appointed by the UMWA and two by the BCOA.

22.     The Trustees were also charged with developing procedures to resolve such disputes. The procedure is invoked by the filing of a request on a standard "resolution of disputes"

---

[1] In order to avoid burdening the record and in the interests of brevity, only the material portions of the NBCWA are attached. Plaintiffs will provide a complete copy of any Exhibit upon request.

form (a "ROD"). Funds staff notifies the interested parties of the dispute and requests written submissions. The issues are researched by Funds staff, consulting the submissions, the plans, and prior precedential ROD decisions. A draft decision is prepared and submitted to the Trustees for consideration.

23.     If the Trustees are able to resolve the dispute, they issue a final and binding decision. If the Trustees are unable to resolve the dispute, it is referred to an independent arbitrator selected by mutual agreement. The decision by the arbitrator is final and binding.

24.     This Court has held that RODs addressing the lifetime retiree health benefits provided through the NBCWA concern "vested benefits, the right to which extends beyond the termination of the contract" and has held such RODS are fully enforceable, even when filed and adjudicated after the expiration of an NBCWA to which a coal company is signatory. Parsons v. Power Mountain Coal Company, Civ No. 2:07-00719, 2009 WL 899457, *12 (S.D.WV March 31, 2009). In Parsons, this Court held that "[e]nforcement of the ROD decisions in this case comports not only with the stated goal in the 1998 NBCWA that the Employer Plans be administered consistently, but also with the sound policy that has embraced arbitration as a peaceful and efficient resolution to labor-management disputes." The Fourth Circuit affirmed, commenting that "[l]est we risk the disruption of the carefully negotiated rules governing labor-management relations within the coal industry, we decline to second-guess the judgment of arbitrators interpreting a complicated collective bargaining scheme comprised of interwoven agreements." 604 F.3d 177, 178 (4th Cir. 2010).

CONSOL Attempts to Unilaterally Terminate Its NBCWA Health Plan

25.     A number of CONSOL subsidiaries – including but not limited to the subsidiaries that formerly employed the individual Plaintiffs - were members of the BCOA and signatory to

the 1974, 1978, 1981, 1984, 1988, 1993, 1998, 2002, 2006, 2007, and the currently-effective 2011 NBCWAs.

26.      During negotiations between the BCOA and the UMWA that culminated in the 2011 NBCWA, CONSOL Chief Executive Officer Nicholas J. DeIuliis led the BCOA Negotiating Committee. He personally signed for the BCOA in portions of the 2011 NBCWA.

27.      CONSOL agreed to provide post-retirement healthcare benefits for certain former employees of its current and former subsidiaries - including the named Plaintiffs in this case - whose benefits are provided in accordance with the Employer Plan established pursuant to the currently-effective 2011 NBCWA.

28.      At a meeting between representatives of the UMWA and CONSOL held on February 11, 2016, CONSOL requested the UMWA 'consent' to a broad outline of a plan to terminate its existing Employer Plan and replace it with two new plans: a plan for pre-65 retirees that shifts costs from the company to the retirees; and a scheme for providing limited cash payments into accounts for post-65 retirees to purchase individual plans.

29.      On or about March 15, 2016, CONSOL transmitted to the retired miner participants in its Employer Plan a letter stating that "[o]n February 11, 2016 we initiated discussions with the UMWA regarding new options for providing healthcare benefits" and promised that "[i]n all events, we will continue to communicate with you in the coming months about this very important matter before any changes are implemented." A true and correct copy of this letter is attached as Exhibit B-1. A similar letter was sent to participants on May 6, 2016, a true and correct copy of which is attached as Exhibit B-2. Both letters encouraged participants to contact the UMWA and UMWA staff subsequently fielded a great number of telephone calls from anxious retirees concerned about their health benefits.

30.    On or about May 3, 2026, CONSOL transmitted to the UMWA a summary of the cash payment scheme it intended to implement following termination of the group insurance provided through the Employer Plan.

31.    The UMWA sent a letter dated May 10, 2016 to CONSOL reiterating its offer to "assist you in exploring means of achieving savings while still fulfilling Consol's legal obligation to maintain benefits at their current levels." The letter specifically offered to "discuss options for adopting and approving managed care and other forms of cost containment," which are cost savings mechanisms subject to specific requirements and procedures included in the NBCWA Employer Plan at Article IV, including a requirement that any such mechanism "will not result in a reduction of benefits or additional costs for covered services provided under the Plan." Consistent with this requirement, the UMWA closed its letter by stating that "[i]n view of Consol's vested statutory and contractual obligations to continue providing benefits at their current levels, the UMWA is not willing to agree to cost shifting or other forms of benefit reductions."

32.    On or about May 26, 2016, CONSOL transmitted a response to the UMWA's May 3 letter in which it asserted that "benefits and benefit levels provided by CONSOL's signatory companies are established for the term of the agreement only" and expressed "hope that we can begin serious negotiations soon." In a follow-up letter dated July 25, 2016, CONSOL expressed that its "objective is to make benefit plan changes effective as soon as our current CBA expires on December 31, 2016" and indicated that this would "require that we enter into certain provider agreements and begin communicating with our Medicare-eligible retirees in early September, 2016."

33.    Representatives of CONSOL and the UMWA met again on August 16, 2016. CONSOL reiterated its intention to terminate and replace its Employer Plan. The UMWA

reiterated its unwillingness to impose increased costs on its retired miners but again offered to discuss the managed care and cost containment options available under Article IV of the Employer Plan.

34.     On or about October 31, 2016, CONSOL transmitted to the UMWA an official notice pursuant to Section 8(d) of the NLRA that all of its subsidiaries signatory to the NBCWA "have permanently terminated their mining operations" and that the subsidiaries would terminate the 2011 NBCWA effective as of its expiration date, December 31, 2016. A true and correct copy of this notice is attached as Exhibit C. The notice stated that CONSOL was prepared to "discuss the non-healthcare effects of this Notice of contract termination to your members" and invited the UMWA to respond "whether you prefer that matters relating to this Notice of contract termination be included as part of our ongoing retiree healthcare negotiations, or whether you prefer to designate different Union representatives for negotiations about non-healthcare matters." Id.

35.     On November 1, 2016, the UMWA filed a ROD with the Trustees noting the parties' dispute as to whether CONSOL may "implement any unilateral changes or modifications of the benefits provided by its plan, either during the term of the 2011 NBCWA or following its termination" and asking for an order that CONSOL "notify its retirees that it cannot make any changes in their benefits without the agreement of the UMWA." Exhibit D.

36.     On or about November 7, 2016, CONSOL transmitted to the UMWA a letter asking for additional dates for "negotiations" with respect to retiree healthcare. The UMWA responded by letter dated November 18, 2016 acknowledging receipt of the termination notice and stating,

> We have nothing to negotiate with respect to the termination of these operations and Agreements or the effects of the same. Relatedly, there is nothing to negotiate with respect to CONSOL and its subsidiaries' continuing obligation to provide retiree healthcare for life to its UMWA-represented retirees, survivors and dependents.

The UMWA's letter reiterated its unwillingness to increase benefit costs for retirees, concluding, "[t]o be perfectly clear, we are not open to negotiating your retiree healthcare commitments beyond the managed care and cost containment discussions contemplated in Article IV." CONSOL responded to the UMWA by letter dated November 21, 2016 stating that it "did not concur with [the UMWA's] declaration that the Union is not open to renegotiating retiree health commitments beyond managed care and cost containment" but claiming "we do not believe the parties need to quibble about this, however, because [CONSOL's] proposals focus on managed care and cost containment."

37.     At no point since January 1, 2016, at the earliest, has CONSOL made proposals to the UMWA to implement the managed care or cost containment mechanisms specified in Article IV of the Employer Plan.

38.     As of November 18, 2016 – the date on which the UMWA declined CONSOL's offer to bargain over the impact of CONSOL's decision to permanently terminate its UMWA-represented mining operations – there were and remain no mandatory subjects over which CONSOL and the UMWA are required by law to bargain.

39.     On November 29, 2016, representatives of CONSOL and the UMWA met once more. CONSOL once again declined the UMWA's offer to discuss managed care and cost containment savings available under the Article IV of the Employer Plan, reiterating its intention to terminate the Employer Plan and replace it with a different plan for retirees under age 65 and a scheme whereby Medicare eligible retirees over age 65 would receive cash payments into Health Reimbursement Accounts ("HRAs") to purchase individual insurance plans. Representatives of CONSOL confirmed that certain beneficiaries, including many spouses and dependents of retired miners, would lose coverage altogether. The UMWA repeated its longstanding objections to

CONSOL's stated intention to breach the NBCWA and mischaracterization of the meeting as a negotiation.

40.     CONSOL transmitted a letter to the UMWA dated December 8, 2016, to which it attached a summary of the scheme by which it intended to offer limited cash contributions to HRAs following its termination of UMWA retirees' group insurance provided through an Employer Plan. In follow-up electronic mail correspondence between counsel, CONSOL informed the UMWA that additional communications would soon be sent to retirees.

41.     On December 22, 2016, the UMWA transmitted a letter to CONSOL reiterating its unwavering position that CONSOL lacked the legal authority to terminate and replace its Employer Plan and asking CONSOL to refrain from transmitting further communications to retirees about such actions pending resolution of the ROD addressing the dispute over whether CONSOL has such authority. The instant lawsuit was commenced shortly thereafter.

## IV.    Count I (Injunction Under Section 301)

42.     CONSOL and the UMWA dispute the former's authority as a signatory to the NBCWA to unilaterally terminate or modify its Employer Plan.

43.     CONSOL has commenced the process of unilaterally terminating and replacing its Employer Plan by communicating its intentions to the UMWA and retired beneficiaries of the Employer Plan. Such conduct is in breach of the NBCWA and the Employer Plan. CONSOL has stated it will send additional communications to retired beneficiaries in the near future in order to continue the process of unilaterally terminating and replacing its Employer Plan.

44.     The UMWA has initiated a ROD that is presently being processed by the Funds in anticipation of a decision by the Trustees or an arbitrator.

45.     CONSOL's ongoing implementation of a plan to unilaterally change the benefits provided through its Employer Plan and communication of the same to Employer Plan beneficiaries threatens irreparable harm.  The ROD process could be rendered meaningless if its critical function resolving labor disputes peacefully and efficiently to ensure consistent administration of retiree health benefits in the coal industry is undermined by CONSOL's actions. A ROD decision prohibiting CONSOL's unilateral action that issues after such action has been taken and/or communicated to Plan Participants will not be able to repair the harm caused to the ROD process's function as a mechanism for peaceful and efficient resolution of disputes. CONSOL's premature communication of major health benefit changes will sow confusion and angst among an aged and vulnerable population, including Plaintiffs and other beneficiaries of the Employer Plan. Participants fearing changes to the Employer Plan are likely to alter their medical care for non-medical financially motivated reasons, causing potential harm to their health that cannot be repaired at a later date. Termination of the group insurance provided through the Employer Plan would cause participants and beneficiaries of the Employer Plan to lose access to medical and pharmaceutical treatments, also causing irreparable harm to their health.

46.     The balance of equities favors granting injunctive relief in aid of the ROD process because (1) the UMWA is willing to commit its best efforts to the expeditious resolution of the pending ROD; (2) hasty termination and replacement of the Employer Plan will cause CONSOL to incur unnecessary expenses and administrative burdens taking actions later deemed improper through the ROD process; (3) CONSOL, a profitable global energy company, is better positioned than a vulnerable and aged population of retired coal miners to bear during the pendency of the ROD the burden of uncertainty as to whether CONSOL is authorized to terminate the group health insurance provided through its Employer Plan.

47.     This Court has long recognized that the peaceful and efficient resolution of labor disputes ensuring uniform administration of the retiree healthcare in the coal industry is in the public interest.

## V.     PRAYER FOR RELIEF

**WHEREFORE**, the UMWA respectfully requests that this Court enter an injunction, after an appropriate hearing, enjoining until issuance of a final and binding decision on the UMWA's November 1, 2016 ROD: (1) any unilateral action by CONSOL to terminate and/or replace the Employer Plan; and (2) any further communication from CONSOL to participants and beneficiaries of the Employer Plan informing them of any changes to the Employer Plan premised on the disputed notion that the obligation to provide the benefits set forth in the Employer Plan terminates at the expiration of the 2011 NBCWA on December 31, 2016.

Respectfully submitted,

/s/ Grant Crandall
Grant Crandall, General Counsel
 W.V. Bar No. 861
Arthur Traynor, Associate General Counsel
 *Visiting Attorney Application Pending*
International Union, United Mine Workers
 of America
18354 Quantico Gateway Drive, Ste. 200
Triangle, VA 22172
Ph: (703) 291-2400
atraynor @ umwa.org

Charles F. Donnelly, Senior Staff Attorney
 W.V. Bar No. 1039
International Union, United Mine Workers
 of America
1300 Kanawha Boulevard East
Charleston, WV 25301
Ph: (304) 346-0341
cdonnelly @ umwa.org

*Counsel for Plaintiffs*